**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Thomas D. Goodwin, Sr.

    v.                                   Civil No. 10-cv-233-PB

Michael J. Astrue, Commissioner,
Social Security Administration


**REPORT AND RECOMMENDATION**


Pursuant to 42 U.S.C. § 405(g), Thomas D. Goodwin, Sr., moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The Commissioner, in turn, moves for an order affirming his decision. For the reasons given below, I recommend that the decision of the ALJ be affirmed.


**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d at 765, 769 (1st Cir. 1991)

(citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a brief Joint Statement of Material Facts, doc. no. 17, along with their own separate statements of material facts, doc. no. 13 (Commissioner) and doc. no. 16 (claimant).  The following discussion is drawn from all three, along with the Administrative Transcript (hereinafter "Tr.").

Goodwin served in the United States Air Force for approximately seven weeks in 1962.  He was honorably discharged, he says, due to the mental and/or emotional stress of basic training.  Goodwin's military record is silent on the reason(s) for his separation from service.  Tr. 973-74.

In 1976, Goodwin was injured in a motorcycle accident. After the accident, he was diagnosed with: "1. Bilateral fractures of the wrist with displacement.  2. Dislocation of the metacarpophalangeal joint left thumb.  3. Acromioclavicular separation left shoulder."  Tr. 871.  Presumably as a result of those injuries, Goodwin was awarded Social Security benefits with a closed period of disability from April 15, 1977, through July 1, 1978.[1]

It is unclear when Goodwin returned to work after his motorcycle accident.  It is well established, however, that he worked at a power plant, doing carpentry, from 1981 through June of 1986, when he suffered a work-related neck injury.  That injury resulted in a workers' compensation claim.  Goodwin has not engaged in substantial gainful work activity since December 31, 1986, which is his alleged onset date.  His last date insured was December 31, 1991.

Goodwin was treated for both his wrist injuries and his neck injury by Dr. Arthur DiMambro, an orthopedist.  In addition, Goodwin received a course of physical therapy in 1986, Tr. 912-19, and received chiropractic treatment in 1987 and 1988, Tr. 920-25.  Finally, the record contains what appear to

---

[1] The records associated with that award are not available, so the court can only presume that it was based on Goodwin's injuries from the motorcycle accident.

be records of treatment by Dr. Melvin Prostkoff, a neurologist, in 1987.  Tr. 883-84.

At some point in the late 1980s or early 1990s – Goodwin cannot recall the dates, and the medical records have been largely destroyed – Goodwin was treated for his neck injury by Dr. Frank Graf, an orthopaedic surgeon.  The only evidence from that treatment is an April 1993 prescription for a one-year membership at an athletic club.  Tr. 747.  There is no evidence in the record – including Goodwin's own testimony – that Dr. Graf ever treated his wrist injuries, or any ongoing pain caused by those injuries, in the 1980s or 1990s.  Goodwin did, however, see Dr. Graf in April of 2007 for an evaluation of "increasing pain at both forearms and writs."  Tr. 1007.  In the medical history sections of the report documenting his initial visit with Goodwin in 2007, Dr. Graf mentioned treatment from two physicians and a physical therapist in the 1970s and 1980s, but said nothing about any treatment he provided Goodwin.  Tr. 748-49.  Based on Goodwin's medical history and a physical examination, Dr. Graf made the following diagnosis:

> Residuals of fracture dislocations of both wrists with
> marked restrictions in ranges of motion both wrists,
> right worse than left; diminished grip strength and
> pinch strength both wrists, right worse than left
> . . . bilateral degenerative osteoarthritis of both
> wrists, radioulnar and radiocarpal, as late residuals
> of 1976 motorcycle accident.

Tr. 751.  As a result of his evaluation, Dr. Graf ordered and interpreted X-rays of Goodwin's wrists, Tr. 751-53, and suggested the consideration of several other tests, Tr. 751, but he prescribed no treatment of any kind.

In March of 2009, Goodwin was referred, apparently by a treating physician, to Frisbee Memorial Hospital for a geropsychiatry consultation due to mood swings.  Tr. 897.  That appears to have been Goodwin's first encounter with a mental-health professional.  Tr. 749, 988.  Nurse practitioner Joyce Williams made the following diagnosis:

> AXIS I:    Mood disorder NOS.
>            Generalized anxiety disorder.
>            Cognitive disorder NOS.  History of mercury
>            exposure, history of multiple sexual
>            encounters.
>
> AXIS II:   Borderline personality traits.
>
> AXIS III:  Non-insulin dependent diabetes, pancreatic
>            endocrine deficiency,
>            hypercholesterolemia, chronic pain.
>
> AXIX IV:   Severe with problems around primary support,
>            social environment, education, occupation,
>            housing, and economics.
>
> AXIX V:    GAF 45-50.

Tr. 989-90.

The record includes a number of medical opinions pertaining to the period after Goodwin's alleged onset date and his last

date insured.[2]  In November of 1986, Dr. DiMambro opined that

Goodwin had no work capacity, as a result of his work-related

neck injury, and that his prognosis remained guarded.  Tr. 948.

In the years that followed, Dr. DiMambro made the following

relevant observations:

> 7/12/87 . . . [M]y feeling at this point is that this
> man ought to be rehabilitated mainly for a light duty
> type of work such as salesmanship, computer type work
> and any work that involves [a] combination of sitting
> and standing, but no bending and not lifting anything
> over about 10 lbs.  I think eventually this man should
> be able to get back into the working field, if he is
> retrained.

Tr. 950.

> 1/12/88 . . . Basically he should be retrained or
> should be looking for a light type of work that
> doesn't involve any heavy lifting, bending, tugging or
> pulling and on that basis, I see no reason why this
> man can't be retrained.  He has a negative neurologic
> exam in the upper extremities.  The main finding is
> some tenderness to palpation over the right side of
> the neck and right scapular area, but neurologically
> he is intact.  There seems to be a little weakness of
> handgrip on the right but it's difficult to tell
> whether that is voluntary or involuntary.  He has had
> fractures of both wrists and that may be a
> contributing factor.

Tr. 950.

---

[2] The record also includes a 1978 opinion from Dr. DiMambro
declaring Goodwin to be "completely disabled and unable to
pursue any type of gainful employment."  Tr. 745.  Goodwin
places great weight on that opinion, but it is of minimal
relevance in that Goodwin received benefits for the injury that
prompted that opinion, those benefits terminated in 1978, and
Goodwin returned to work in 1981.

> 11/20/89 . . . I feel that he is totally disabled as
> far as any type of heavy work is concerned such as
> construction work, carpentry work and work of that
> nature.  However, he is not totally disabled as far as
> being retrained for [a] lighter type of work such as
> bench work, computer work and work of that nature.

Tr. 951.

In the fall of 1986, in the context of Goodwin's workers'
compensation claim, Dr. Richard Levy examined Goodwin and
reported his opinion that Goodwin was able to perform all
activities of daily living and that his examination showed that
Goodwin was able to lift ten pounds in various ways.  Tr. 864.
Also in the context of the workers' compensation claim, an
examining orthopedist, Dr. Philip Salib, opined in January of
1987, that while Goodwin could not "do heavy work for the time
being," he could "do light duties" so long as he avoided heavy
lifting and bending over.  Tr. 867.  Dr. Stephen Dell, an
examining neurologist, offered a similar opinion in June of
1987.  Tr. 886.  Dr. Dell also completed an Estimated Functional
Capacity Form in which he determined that Goodwin could use both
hands for simple grasping and fine manipulating, but could not
use either hand for firm grasping.  Tr. 890.  Dr. Joel Thorn, a
treating chiropractor, offered the same opinion in a Work
Capacity Rating Form he completed in March of 1988.  Tr. 919.
Finally, in an April, 1988, letter to attorney Laurence Getman,

presumably in the context of Goodwin's workers' compensation claim, Dr. Donald Belliveau, an orthopedist, reported on his examination of Goodwin, and offered his opinion that Goodwin was employable at that time, with restrictions pertaining only to his right shoulder.  Tr. 898.

In April of 2008, Dr. Graf completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), Tr. 852-858, but that form pertained only to Goodwin's abilities at the time the form was completed, Tr. 857.  In June of 2009, Dr. Graf completed a Residual Functional Capacity ("RFC") Questionnaire that appears to cover the relevant time period. In that questionnaire, Dr. Graf opined that due to tendon injuries in the left ankle and upper back pain, Graf was able to sit, stand, and walk continuously for one hour in an eight-hour work day, and could do those things for a total of one hour in an eight-hour workday.  Tr. 1003.  He reported that due to hand and wrist pain, Goodwin was able to lift ten pounds occasionally but could never lift any more than that.  Id.  He offered the same limitation for carrying.  Tr. 1004.  Again citing limitations due to hand and wrist pain bilaterally, Dr. Graf opined that Goodwin was able only occasionally to reach, handle, finger, grasp, push, and pull with each arm.  Id.  Dr. Graf also noted that Goodwin could use his right foot, but not his left

foot, for repetitive movements in operating foot controls.  Id.
In addition, Dr. Graf stated that Goodwin could only
occasionally squat, crawl, climb, reach above, stoop, crouch,
and kneel, due to hand and wrist pain and neck and upper back
pain.  Tr. 1005.  Finally, Dr. Graf indicated that Goodwin was
never able to tolerate exposure to unprotected heights or dust,
fumes and gases, and was only occasionally able to tolerate
being around moving machinery, exposure to marked temperature
changes, driving automotive equipment, and exposure to noise.
Id.

　　　Dr. Graf's RFC questionnaire also cites a narrative report
he wrote in June of 2009, which he described as "a review of
medical history combined with orthopaedic examination," Tr.
1007.  Notwithstanding Dr. Graf's identification of tendon
problems in Goodwin's left ankle in his REF questionnaire, his
narrative report mentions no medical records pertaining to an
ankle impairment.  Moreover, Dr. Graf's physical examination was
limited to Goodwin's neck and upper extremities, Tr. 1011, and
the report actually discusses only Goodwin's forearms, wrists,
and hands.  Tr. 1011-12.  In his report, Dr. Graf reported a
loss of flexion in Goodwin's right ring finger and abnormal
ranges of motion of both wrists.  Tr. 1012.  He also listed

numerical results of two kinds of strength testing, but gave no indication of what normal results would be.[3]  Id.

Dr. Graf summarized his report by stating that "Thomas Goodwin has been disabled for all employment since 1986."  Tr. 1012.  According to Dr. Graf:

> A complete review of [Goodwin's] medical records documents his severely displaced bilateral fractures of the wrists and metacarpal phalangeal joint of the left thumb and acromioclavicular separation of the left shoulder in 1976.  Over a period of 10 years, he was followed by Dr. Arthur Dimambro with not only complications of his wrist injuries but also neck and back pain.  Based upon my knowledge of the patient's current condition and the severity of his upper extremity disabilities, as well as his cervical and lumbrosacral condition, it is my opinion that he has been disabled for all employment since 1986.  The opinions of Dr. Levy appear to be prejudicial and I do not agree with the opinions of Dr. Belleview in a 1988

---

[3] On the Jamar dynamometer for power grip, Dr. Graf noted maximum strength of power grip on the right as 15, 10, and 10 kilograms of force in three repetitions, and reported strength on the left as 25, 22, and 25 kilograms of force in three repetitions.  Tr. 1012.  In 1986, Dr. Levy reported, as a result of a neurological examination: "Testing revealed normal muscle bulk and full power throughout, both formally and functionally tested.  Hand grasps were equal at about 30 kg."  Tr. 874.  A 1986 kinesiology progress report indicated a power grip of 37 kg., which was described as "fall[ing] in the below average category."  Tr. 916.  In early 1987, Dr. Salib reported a grip strength of 90 pounds for the dominant right hand and 80 pounds for the left.  Tr. 866.  Later that year, Dr. Prostkoff reported: "Hand grasp is 30 kg bilaterally."  Tr. 884.  A diagnostic evaluation in 1988 revealed a right hand grip of 32 kg. and a left hand grip of 44 kg.  Tr. 907.  Finally, Dr. Graf's 2007 testing revealed both deficits in strength measured with the Preston pinch guage and "[p]ower grip . . . diminished on the right at 12kg pressure, 14kg, 12kg in three repetitions and on the left at 26kg, 30kg, and 24 kg.  Tr. 750.

evaluation.  I am in total agreement with Dr.
Dimambro's findings, which were submitted as a
treating physician of many years duration.  Dr.
Dimambro found that he had no work capacity and that
he had a guarded prognosis in 1986.[4]

. . . .

Thomas Goodwin is considered by this examiner to
entirely meet the criteria of Listing 1.02 Major
dysfunction of joints with gross anatomical deformity,
chronic joint pain, stiffness and limited motion with
joint space narrowing and bone destruction and
ankylosis of the radioulnar and radiocarpal joints.
He has on x-ray examination malunion of both distal
radiuses with progressive deterioration of the
radiocarpal joints and the radioulnar joints.  He
meets the criteria of involvement of a major
peripheral joint in each upper extremity right and
left.  He has significant disruption in his ability to
perform effective hand functions with documented and
substantial weakness in power grip in both upper
extremities right worse than left with right hand
dominance noted.  His bilateral upper extremity joint
dysfunction at the wrists represents a late
complication of his fractures of the distal radius
with malunion right and left occurring at age 33.
There are no effective surgical interventions, which
can reverse the bilateral distal radial fracture
malunions and radiocarpal and radioulnar degenerative
osteoarthritic changes.

Tr. 1012-13.  Dr. Graf subsequently amended his report to

specify his opinion that "Goodwin's orthopaedic condition [has]

met Listing 1.02 . . . since 1986" because "[h]e has had

substantial functional limitations in grasping, fingering,

_____

[4] The record discloses that by January of 1988, at the
latest, Dr. DiMambro held the opinion that Goodwin had the
physical capacity to perform light work.  Tr. 950.

pushing and pulling since 1986 rendering him disabled from that date onward."  Tr. 1024.

The record also includes a Psychiatric Review Technique form completed by Nicholas Kalfas covering the period from December 31, 1986, through December 31, 1991.  Tr. 805-18. Kalfas reported no medically determinable mental impairment. Tr. 805.

In July of 2009, Goodwin's psychiatric nurse practitioner, Joyce Williams, referred him to Dr. Craig Stenslie for a psychological evaluation.  Tr. 1020-23.  In particular, Williams asked Dr. Stenslie to "assess [Goodwin's] cognitive functioning and the possible presence of an organic brain disorder, specifically some type of degenerative dementia."  Tr. 1020. Dr. Stenslie administered a battery of tests, including the Aphasia Screening Battery, the WAIS-III, the Wechsler Memory Scale, Trials A, the Rey Figure, and Controlled Oral Word Lists. Tr. 1022.  While Dr. Stenslie ruled out "a diagnosis of degenerative dementia, either of an Alzheimer's or vascular type," Tr. 1023, he opined that "it is certainly conceivable that at least some part of his cognitive difficulty and propensity for fogginess is a long-term residual effect of his history of concussions," id.

Shortly thereafter, Dr. Barbara McKim completed a psychological evaluation based on an examination she conducted at the request of Goodwin's counsel.  Tr. 1014-19.  Dr. McKim's testing included the MMPI-2, the Millon, and the Rorschach tests.  She concluded her evaluation this way:

> In summary, findings are indicative of a man who experiences generalized anxiety with agitated features, a dysthymic mood, and cognitive compromise evidenced in some confusion, problems with sustaining attention and concentration, difficulties with modulating mood and behaviors, and difficulties with cognitive efficiency (consistent with Dr. Stenslie's findings).  Given the longevity of his difficulties, it also appears likely that this man's more acute symptoms of distress occur in the context of longstanding personality traits or disorders that may best be characterized by Cluster B and/or Cluster C characterological features that cover a broad spectrum of difficulties with functioning, including having difficulties with maintaining controls, being avoidant and dependent, and being excessively self-involved.

Tr. 1018.

At the request of Goodwin's counsel, Dr. Graf reviewed the reports by Joyce Williams, Dr. Stenslie, and Dr. McKim, and submitted the following addendum to his previous report: "Based upon my review of this material . . . it is my opinion that [Goodwin] has been totally disabled since 1986 with a combination of severe upper extremity orthopaedic injuries, head injuries and a neuropsychiatric condition with an organic brain disorder."  Tr. 1028.

The ALJ conducted a hearing on Goodwin's claim that spanned three sessions.  At the second session, he heard telephonic testimony from a medical expert, Dr. John Axline, and a psychological expert, Dr. Pricilla Hoffnung, as well as live testimony from a vocational expert ("VE").  At the hearing, Goodwin's counsel asked the ALJ to direct Dr. Axline to review Goodwin's wrist x-rays,[5] presumably to set the stage for a future cross-examination of Dr. Axline based on the x-rays.  The ALJ agreed to accept the x-rays into the record but declined to require Dr. Axline to review them.

After the hearing, the ALJ issued a decision that included the following findings of fact and conclusions of law:

> 3. Through the last date insured, the claimant had the following severe impairments: bilateral wrist fractures status post surgery, cervical sprain and a mood disorder (20 CFR 404.1520(c)).
>
> . . . .
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> . . . .

---

[5] At the hearing, Goodwin's counsel described the x-rays in question as being "ancient," Tr. 114, but in his brief, Goodwin seems to suggest that the x-rays at issue were the ones Dr. Graf ordered in 2007.  For reasons explained below, it is not necessary to resolve that bit of confusion.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant has been limited to only occasional interaction with co-workers, the public and with supervisors.

. . . .

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

. . . .

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

Tr. 24, 26, 28, 30.

Goodwin appealed the ALJ's decision to the Decision Review Board ("DRB"), which affirmed.  Tr. 1.  More specifically, the DRB rejected Goodwin's claims that the ALJ violated the rules for conducting a hearing and failed to give the proper weight to Dr. Graf's opinion.  Tr. 1-2.

### Discussion

According to Goodwin, the ALJ's decision should be reversed, and the case remanded, because the ALJ committed ten separate legal errors.  Unfortunately, Goodwin's assignments of error do not track in any discernable way the analytical scheme

mandated by the relevant statutes and regulations.  Helpfully, the Commissioner has undertaken the rather daunting task of reframing Goodwin's objections to the ALJ's decision.  Based upon that reframing, and the court's own consideration of Goodwin's arguments, the court understands Goodwin to be asserting that the ALJ's decision should be reversed because the ALJ erred in determining that: (1) he did not have a listing-level impairment of his wrists; and (2) he was capable of performing jobs that exist in significant numbers in the national economy despite having a wrist impairment and a mood disorder.  In the discussion that follows, the court reviews those two determinations, and then concludes by addressing, briefly, any of Goodman's remaining arguments that are not addressed by the court's disposition of the two principal arguments.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question in this case is whether Goodwin was under a disability between his alleged onset date, December 31, 1986, and his last date insured, December 31, 1991.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the

application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

    The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  However,

    [o]nce the [claimant] has met his or her burden at
    Step 4 to show that he or she is unable to do past
    work due to the significant limitation, the
    Commissioner then has the burden at Step 5 of coming
    forward with evidence of specific jobs in the national
    economy that the [claimant] can still perform.  Arocho
    v. Sec'y of Health & Human Servs., 670 F.2d 374, 375
    (1st Cir. 1982).  If the [claimant's] limitations are
    exclusively exertional, then the Commissioner can meet
    her burden through the use of a chart contained in the
    Social Security regulations.  20 C.F.R. § 416.969;
    Medical-Vocational Guidelines, 20 C.F.R. pt. 404,
    subpt. P, App. 2, tables 1-3 (2001), cited in 20
    C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458
    (1983). "The Grid," as it is known, consists of a
    matrix of the [claimant's] exertional capacity, age,
    education, and work experience.  If the facts of the
    [claimant's] situation fit within the Grid's

categories, the Grid "directs a conclusion as to
whether the individual is or is not disabled."  20
C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited in
20 C.F.R. § 416.969.  However, if the claimant has
nonexertional limitations (such as mental, sensory, or
skin impairments, or environmental restrictions such
as an inability to tolerate dust, id. § 200(e)) that
restrict his [or her] ability to perform jobs he [or
she] would otherwise be capable of performing, then
the Grid is only a "framework to guide [the]
decision," 20 C.F.R. § 416.969a(d) (2001).  See also
Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)
(discussing use of Grid when applicant has
nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) plaintiff's
> subjective claims of pain and disability as supported
> by the testimony of the plaintiff or other witness;
> and (3) the plaintiff's educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

A. Wrist Impairment – Step Three

At step three of the sequential evaluation process, the ALJ

determined that between December 31, 1986, and December 31,

1991, Goodwin's wrist impairments did not meet or equal Listing

1.02.  Goodwin raises numerous objections to that determination,

including: (1) the ALJ's admission of telephonic testimony from

Dr. Axline; (2) his inability to cross-examine Dr. Axline with

certain x-rays; and (3) the ALJ's decision to credit the opinion
of Dr. Axline over the opinion of Dr. Graf.  Goodwin's
objections are without merit; the ALJ's step-three determination
is supported by substantial evidence.

### 1. Substantial Evidence

Under the category of musculoskeletal impairments, the
regulations identify Listing 1.02 as "[m]ajor dysfunction of a
joint(s) (due to any cause)."  20 C.F.R. § 404, subpt. P, app.
1.  That impairment is described as follows:

> Characterized by gross anatomical deformity (e.g.,
> subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with
> signs of limitation of motion or other abnormal motion
> of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing,
> bony destruction, or ankylosis of the affected
> joint(s).  With:
>
> . . . .
>
>      B. Involvement of one major peripheral joint in
> each upper extremity (i.e., shoulder, elbow, or wrist-
> hand), resulting in inability to perform fine and
> gross movements effectively, as defined in 1.00B2c.

Id.  Regarding the inability to perform fine and gross movements
effectively, the regulations provide:

> Inability to perform fine and gross movements
> effectively means an extreme loss of function of both
> upper extremities; i.e., an impairment(s) that
> interferes very seriously with the individual's
> ability to independently initiate, sustain, or
> complete activities.  To use their upper extremities

        effectively, individuals must be capable of sustaining
        such functions as reaching, pushing, pulling,
        grasping, and fingering to be able to carry out
        activities of daily living.  Therefore, examples of
        inability to perform fine and gross movements
        effectively include, but are not limited to, the
        inability to prepare a simple meal and feed oneself,
        the inability to take care of personal hygiene, the
        inability to sort and handle papers or files, and the
        inability to place files in a file cabinet at or above
        waist level.

20 C.F.R. § 404, subpt. P, app. 1, § 1.00B2c (emphasis added).

Goodwin devotes considerable attention to the importance of the 2007 x-rays and the ALJ's refusal to require Dr. Axline to review them.  He goes so far as to invite the court to review those x-rays itself because, in his view, "with common sense any human being looking at the X-Rays (now filed with this Court) will see the obvious deformity in the Plaintiff's wrists." Pl.'s Mem. of Law (doc. no. 8-1), at 6.  However, the fact that Dr. Axline has not seen Goodwin's x-rays has no bearing on any issue before the court.  At the hearing, Dr. Axline never disputed the existence of gross anatomical deformities to Goodwin's wrists (which is what Goodwin says the x-ray show). Moreover, the ALJ never determined that Goodwin did not have gross anatomical deformities.  Rather, the ALJ based his decision on an absence of evidence that, at any time prior to December 31, 1991, Goodwin was unable to perform fine and gross movements effectively.  As noted above, an inability to perform

fine and gross movements effectively is necessary to establish
an impairment that meets Listing 1.02.

For his part, Goodwin identifies no evidence in the record
from the relevant time period that would support the requisite
finding.  Instead, he points to Dr. Graf's 2008 medical-source
statement that applied to "current limitations only," Tr. 968,
Dr. Graf's retrospective RFC questionnaire from 2009, and the
2009 report by Dr. Graf – who never treated Goodwin for his
wrist injuries until 2007, if at all – which states that
Goodwin's "bilateral upper extremity joint dysfunction at the
wrists represents a late complication of his fractures of the
distal radius with malunion right and left occurring at age 33,"
Tr. 1013 (emphasis added).  How late a complication the
dysfunction is, Dr. Graf does not say.  The only other evidence
Goodwin points to is his own testimony at the hearing, Tr. 47-
48, 150-52, which pertained largely to a description of his
current hand and wrist pain but also indicated, somewhat
ambiguously,[6] that he has suffered from pain in his wrists ever
since his motorcycle accident.  Moreover, Goodwin mentioned

---

[6] Goodwin testified that his hands and wrists "always were
painful from the time [he] had the [motorcycle] accident."  Tr.
48.  But later, when asked whether hand and wrist pain
sufficient to interfere with his ability to concentrate had been
going on during the relevant time period, he told the ALJ: "To
be honest with you I don't know, I assume it has . . . ."  Tr.
152.

pain, but said nothing about the effect of the pain he mentioned on his ability to perform fine and gross movements effectively during the relevant time period other than to say that he has always had trouble driving.  Tr. 47.

On the other hand, the records of Goodwin's medical treatment and examinations during the relevant time period contradict any contention that he was unable to perform gross and fine movements effectively with his upper extremities at that time.  As the ALJ correctly noted, the record contains no evidence that Goodwin ever sought or received treatment for his wrist injuries, or symptoms associated with those injuries, at any time from 1978 through December 31, 1991.

Beyond that, in 1988, the orthopedist who treated Goodwin for both his wrist injuries and his neck injury, Dr. DiMambro, noted an occasional weakness of grip and observed that Goodwin's wrist injuries "may be a contributing factor," Tr. 950, but nevertheless suggested that Goodwin should be retrained for light work, albeit work that did not involve tugging or pulling, id.  On that basis, it seems clear that Dr. DiMambro did not hold the opinion that Goodwin lacked the functional capacity to perform fine and gross movements effectively in 1988.

In his initial evaluation for chiropractic treatment in June of 1988, Goodwin informed Dr. Thorne of his 1976 injuries,

but did not mark his wrists in the pain diagram he filled out.
Tr. 918.  Shortly thereafter, a treating chiropractor found
Goodwin capable of simple grasping and fine manipulating with
both hands, determining only that he was not able to push and
pull with his hands.  Tr. 920.

The observations of Goodwin's examining physicians are in
line with those of his treating physicians.  For example, after
an independent medical examination in April of 1987, Dr. Dell
reported that Goodwin's "[e]xtremities examination show[ed] no
inflammation, irritation or atrophy of the muscles and bones and
joints are intact."  Tr. 887-88.  Dr. Dell further opined that
Goodwin was capable of simple grasping and fine manipulating
with both hands, but was not capable of firm grasping.  Tr. 890.
In a May, 1988, independent neurological opinion requested by
Goodwin's chiropractor, Dr. Frederick Carrick reported Goodwin's
description of the 1976 motorcycle accident and its aftermath:

> He fractured his left shoulder in 1976.  He had a pin
> in it for a while at the clavicle and scapula.  He
> also fractured both of his wrists at the same time.
> These both occurred in a motorcycle accident in 1976
> when he was struck by a van.  The motorcycle was going
> approximately 40 miles per hour when the van ran a
> stop sign.  He ran into the side of the van and was
> thrown over the handlebars into the van.  He wore a
> helmet and full leathers at this time.  He also
> sustained a slight concussion.  He has had no problems
> since.

Tr. 902 (emphasis added).  In an evaluation conducted in April of 1988, Dr. Belliveau, an examining orthopedist, reported:

> Power in the upper extremities was acceptably good this performed by the patient squeezing the examiner's index and long fingers and with the elbows at the side resisting flexion-extension, abduction and adduction as well as pronation and supination.  After repeat evaluation of the right upper extremity patient complained of a "sprained feeling" about the shoulder-chest complex.

Tr. 895.  Dr. Belliveau reported no complaints about wrist pain. In a pain diagram he filled out for Dr. Belliveau, Goodwin made no marks on his left wrist and only a few on his right wrist. Tr. 899.  In sum, there is substantial medical evidence in the record to support the ALJ's determination that Goodwin failed to carry his burden of demonstrating that he was not capable of performing fine and gross movements effectively with his wrists and hands during the relevant time period.

The non-medical evidence is to similar effect.  In 1987, Goodwin told Dr. Prostkoff that he was working as a self-employed specialty auto mechanic.  Tr. 878.  At his hearing before the ALJ, Goodwin offered no testimony to suggest that he had an extreme loss of function in his wrists and hands between December 31, 1986, and December 31, 1991.  The ALJ specifically elicited testimony on that point and found, supportably, that

Goodwin was physically able to drive,[7] pay his own bills, use a checkbook, purchase groceries, and collect coins.  Tr. 27.  The record also establishes that while Goodwin had some problems with personal hygiene, Tr. 129-30, he was able to take care of laundry, Tr. 129, cooking, shopping, and cleaning, Tr. 132-34.  So, substantial non-medical evidence also supports the ALJ's determination that Goodwin has not carried his burden of demonstrating that his wrist impairments rendered him incapable of effectively performing fine and gross movements of his wrists and hands during the relevant time period.

### 2. Telephonic Testimony

As noted, Goodwin objects to the ALJ's admission of telephonic testimony from Dr. Axline and argues that it must be stricken.  If required to decide the issue, the court would disagree, on grounds that: (1) Goodwin did not raise a contemporaneous objection to the disputed manner of testimony; (2) he has not indicated how he was prejudiced by the admission of telephonic testimony from Dr. Axline; (3) the regulations on which Goodwin relies, 20 C.F.R. §§ 404.936(c) and 404.950(a), do not disallow telephonic testimony, which means that the Social

_____

[7] While Goodwin testified that he has always had trouble driving, Tr. 47, he also testified that during the relevant time period, he did have a car and was able to drive to stores and shop for himself and his son, Tr. 133-34.

Security Hearings, Appeals and Litigation Law Manual, which does
allow such testimony, does not conflict with the regulations;
(4) the court of appeals for this circuit has never barred
telephonic testimony by medical experts in Social Security
administrative hearings; and (5) while not addressing the
regulatory issue, the Eighth Circuit has held that an ALJ's
receipt of telephonic testimony from a consultative examining
physician does not violate a social security claimant's right to
due process, see Hepp v. Astrue, 511 F.3d 798, 805-06 (8th Cir.
2008).  Furthermore, Goodwin's statement that "[u]nlike the
situation with Dr. Axline, [he has] no objection to [Dr.
Huffnung's] testimony being by telephone," Pl.'s Mem. of Law, at
7, strongly suggests that Goodwin's real problem with Goodwin's
testimony is its content, not the manner in which it was
presented.  But, more importantly, even if Dr. Axline's
testimony were to be stricken, there would still be substantial
evidence in the record to support the ALJ's determination that
Goodwin's wrist fractures did not meet or equal a listed
impairment between December 31, 1986, and December 31, 1991.

### 3. Opinion of the Treating Physician

Goodwin also takes issue with the ALJ's acceptance of Dr.
Axline's opinion and his rejection of Dr. Graf's opinion.

Specifically, he points out that Dr. Axline neither examined him nor reviewed the x-rays he produced at the hearing, and that Dr. Graf was a treating physician.  That is, Goodwin relies on the so-called "treating physician rule."

There are several problems with Goodwin's invocation of the treating physician rule.  First, Dr. Graf appears never to have actually treated Goodwin for the wrist injury (or wrist pain) he claims to be a listing-level impairment and, according to Dr. Graf himself, the "treating physician opinion" on which Goodwin relies so heavily was based on a review of medical records and an examination, but <u>not</u> on any treatment Goodwin received from Dr. Graf.  Beyond that, Goodwin criticizes the ALJ for rejecting Dr. Graf's opinion, but nowhere indicates precisely what statement(s) by Dr. Graf the ALJ should have accepted.  That, in turn, makes it difficult to know whether Goodwin is relying on a proper "medical opinion" or on a treating source statement on an issue reserved to the commissioner, and also makes it difficult for the court to perform the requisite legal analysis which, among other things, entails assessing the record support for the opinion, and its consistency with the record as a whole.

The Commissioner and, by extension, the ALJ, must consider and evaluate the medical opinions in a claimant's case record. 20 C.F.R. §§ 404.1527(b) & (d).  The relevant regulation defines

"medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant'] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  But, the term "medical opinions" does not cover medical source statements on issues reserved to the Commissioner such as whether a claimant is disabled, or whether a claimant's impairment meets or equals a listing.  See 20 C.F.R. § 404.1527(e).  That definition rules out, as a medical opinion, Dr. Graf's statement that "Thomas Goodwin has been disabled from all employment since 1986."  Tr. 1012.

Turning to the mechanics of the treating physician rule, "[i]f any of the evidence in [a claimant's] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the Commissioner] will weigh all of the evidence."  20 C.F.R. § 404.1527(c)(2).  As a general matter, the Commissioner gives more weight to opinions from examining sources than to opinions from non-examining sources, and the greatest weight of all to opinions from treating sources.  See 20 C.F.R. § 404.1527(d).  Moreover, "[i]f [the commissioner] find[s] that a treating source's opinion on

the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

But, "[w]hile generic deference is reserved for treating source opinions, the regulations also presuppose that nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record."  Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037 (unreported table decision), 1994 WL 251000, at *4 (1st Cir. 1994) (citations omitted); see also Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (collecting cases in which opinions of treating physicians have been properly discounted).  When the Commissioner does not give controlling weight to the medical opinion of a treating source, he must do so based upon factors including the length of the treatment relationship, the nature and extent of that relationship, the supportability of the opinion, its consistency with the record as a whole, and the specialization of the medical source.  See 20 C.F.R. § 404.1527(d).  Finally, the

Commissioner is obligated to explain the weight he gives to a treating source's opinion.  See id.

Here, the ALJ gave little weight to Dr. Graf's opinions, and did so in a manner that was consistent with 20 C.F.R. § 404.1527.  He noted, with strong support in the record, that Dr. Graf did not evaluate Goodwin's wrists until sixteen years after he was last insured.  The ALJ also noted that Dr. Graf offered opinions on environmental limitations that had no support in the medical record.  Beyond that, the court notes that: (1) Goodwin describes Dr. Graf as a treating physician in his legal briefs, but there is no reference in the briefs or evidence in the record describing any actual treatment by Dr. Graf other than a single prescription for an athletic-club membership in 1983;[8] (2) when Dr. Graf treated Goodwin in the 1980s or 1990s, the treatment was for Goodwin's neck injury, not his wrist injury, which is the only physical impairment on which Dr. Graf provided any substantive consideration in his opinion; (3) Dr. Graf's opinion concerning Goodwin's limitations during the relevant time period seems to be based on little more than the same kind

---

[8] An absence of treatment notes, alone, does not provide a basis for rejecting the medical opinion of a treating source. See Soto-Cedeño v. Astrue, 380 F. App'x 1, 2 (1st Cir. 2010). But here, neither the doctor nor the patient has even mentioned any treatment by Dr. Graf for Goodwin's wrist injuries or wrist pain.

of record review that Dr. Axline performed; (4) Dr. Graf's 2009 examination of Goodwin resulted in medical findings related to Goodwin's wrists and hands, but none that would support the limitations on sitting, standing, and walking that Dr. Graf posited in his RFC questionnaire; (5) Dr. Graf describes several functional limitations related to an ankle injury that does not appear to be documented in the record and that, as a consequence, is not shown to have predated Goodwin's last date insured; and (6) Dr. Graf's opinions are inconsistent with multiple opinions given by treating and examining physicians during the relevant time period.  Based on the foregoing, the court concludes that the ALJ properly gave little weight to Dr. Graf's opinion.  Conversely, he properly credited Dr. Axline's opinion, which is both well supported and consistent with the record as a whole, including Dr. DiMambro's view, back in the late 1980s, that Goodwin had the physical capacity to perform light work, notwithstanding his wrist and neck injuries.

## B. Mood Disorder – Step Five

At step five of the sequential evaluation process, the ALJ determined that between December 31, 1986, and December 31, 1991, Goodwin retained the residual functional capacity to work, at the light exertional level, as an inspector/hand packager and

as a driver/car jockey, notwithstanding his moderate
difficulties in social functioning.  The ALJ also noted that the
VE testified that Goodwin could meet the functional demands of
two sedentary jobs, dispatcher and timekeeper.

Goodwin argues that during the relevant time period, he was
completely disabled by his mental health condition, both "alone
and in combination."  Pl.'s Mem. of Law, at 7.  His argument
goes like this: (1) at the hearing, Dr. Hoffnung testified that
in her opinion, Goodwin has suffered from a personality disorder
since before December 31, 1991;[9] (2) for purposes of measuring
Goodwin's mood disorder against the "B" criteria of Listing
12.04 (affective disorders), Dr. Hoffnung testified that Goodwin
had marked difficulties in maintaining social functioning; (3)
the ALJ found at the hearing that Goodwin had marked
difficulties in maintaining social functioning and was somehow
estopped from making a different finding in his written
decision; and (4) the VE testified that a person with serious
difficulties in getting along with others could not hold any
job.  In Goodwin's view, once the ALJ made a finding, at the

---

[9] Dr. Hoffnung's actual testimony was that "there's really
very little in the record that indicates any level of
psychological problems," Tr. 120, but that "it does appear that
[Goodwin] manifests some traits that . . . are associated with
personality disorders," Tr. 123, and that those traits dated
back to before 1991, id.

hearing, that Goodwin had marked difficulties in maintaining
social functioning, he was required to adopt the VE's
determination that Goodwin was mentally unfit for any
employment.

As a preliminary matter, leaving aside Goodwin's legally
suspect assertion that the ALJ acted improperly when he "reneged
on his own finding on the record that he agreed with Dr. H.
[sic] that the Plaintiff's impairment in the domain of getting
along with others was 'marked'," Pl.'s Mem. of Law, at 9, the
Commissioner points out, correctly, that the ALJ never made the
finding Goodwin attributes to him.  Rather, the ALJ merely
clarified Dr. Hoffnung's statement that she believed Goodwin
suffered from a marked difficulty in maintaining social
functioning.  The only finding on that issue the ALJ ever made
was the one in his written decision, i.e., that "[i]n social
functioning, the claimant had moderate difficulties."  Tr. 27.
That determination, in turn, is supported by substantial
evidence including Goodwin's own testimony that during the
relevant period, he attended sports functions with his son,
dealt with his son's teachers, attended church, and had several
girlfriends.  It was well within the ken of the ALJ, see Irlanda
Ortiz, 765 F.2d at 769, to find that the evidence described
above outweighed the evidence going the other way, which

consists of not much more than a physical altercation with a
police officer, an instance in which Goodwin struck his son, and
Goodwin's dispute with a foreman at work who told him to jump a
five-foot gap between two work platforms that were 150 feet
above the ground.

Moving, then, to the ALJ's step-five determination itself,
that, too is supported by substantial evidence.  The ALJ asked
the VE two hypothetical questions, one based on marked
difficulties in maintaining social functioning, the other based
on the moderate difficulties the ALJ actually found.  While the
VE – who heard Goodwin's testimony – opined that a person with
marked difficulties would not be employable, he opined that a
person with the moderate difficulties the ALJ actually found
could perform a variety of jobs.  Thus, the ALJ's step-five
determination is supported by substantial evidence.

### C. Goodwin's Remaining Assignments of Error

The foregoing discussion seems to dispose of Goodwin's
first, second, third, fourth, and eighth legal issues.  In this
section the court turns, briefly, to Goodwin's five remaining
legal issues.

Goodwin's fifth legal argument is that the ALJ and the DRB
misunderstood the evidence by relying on doctors' statements

arising out of medical treatment and evaluation related to his
1986 neck injury (including workers' compensation records), when
the principal physical impairment on which he bases his
disability claim resulted from his 1976 wrist injury.  That
argument is without merit.  Many of the physicians who saw
Goodwin between 1986 and 1991 examined his entire body,
including his wrists, notwithstanding the fact that their
primary concern was his 1986 neck injury.  Moreover, it is both
telling and relevant that virtually all of Goodwin's medical
records from 1986 through 1991 arose out of his 1986 injury.  If
he were still suffering significant limitations as a result of
his 1976 wrist injuries, it is reasonable to believe that he
would have sought treatment for those injuries and/or any pain
they were still causing him, or that he would have at least
mentioned wrist pain to the multitude of doctors who treated and
examined him.  Medical records to that effect are sparse, at
best.  Moreover, the court notes that the physician who
repeatedly urged Goodwin to seek employment in 1988 and 1989, in
occupations that would seem to involve a considerable amount of
fine and gross movements of the hands and wrists, was the
orthopedist who had previously treated his wrist injuries, Dr.
DiMambro.

Goodwin's sixth legal argument is that the ALJ
misunderstood the work he did at the power plant in the early
1980s.  Specifically, he argues:

> The DRB makes no comment about the Plaintiff's work in
> pain at the power plant. . . .
>
>      What is missing here is analysis by the DRB and
> the ALJ of the Plaintiff's testimony and record
> entries that he worked in pain while at the power
> plant. . . .
>
> . . . The ALJ does extensively attack the Plaintiff's
> credibility about his pain generally, but not during
> the crucial time he was at work at the power plant.
> This is a glaring error because the then treating
> orthopaedic surgeon (Dr. DiMambro) made it clear that
> the neck and wrist problems were permanent, at an end
> point, and had to be lived with.[10]

Pl.'s Mem. of Law, at 15-16.  Whether Goodwin was suffering from
pain in his wrists while he was working at the power plant is
entirely irrelevant.  Because he was working, any wrist pain he
had was, necessarily, not disabling.  If Goodwin had applied for
Social Security disability benefits at any time during his
employment at the power plant, his application would have been
properly denied at step one.  See Seavey, 276 F.3d at 3.
Goodwin is correct in referring to his time at the power plant
as "crucial," but that time is crucial not because he was in
pain, but because he was working, which conclusively establishes

---

[10] This final sentence is a bit difficult to understand in
that Goodwin did not suffer his neck injury until the end of his
stint at the power plant.

an absence of disabling pain.  In short, Goodwin's sixth legal argument is unavailing.

Goodwin's seventh legal argument defies easy characterization.  He argues that "[t]he Treating Doctor Rule and the Substantial Evidence Rule are <u>again</u> violated by the DRB and the ALJ concerning some old file and some new file medical records."  Pl.'s Mem. of Law, at 17.  As best the court can tell, Goodwin is challenging the ALJ's reliance on Dr. Axline's reliance on Dr. Belliveau's and Dr. McKim's identification of possible symptom magnification as a basis for making a negative assessment of the credibility of his claims of disabling pain. The court finds no fault with the ALJ's decision not to credit Goodwin's apparent claim that he has suffered from disabling pain ever since his alleged onset date.

According to Social Security Ruling ("SSR") 96-7p, "an individual's statement(s) about his or her symptoms[11] is not in itself enough to establish the existence of a physical or mental impairment or that the individual is disabled," 1996 WL 374186, at *2.  When "symptoms, such as pain, fatigue, shortness of

---

[11] "A symptom is an individual's own description of his or her physical or mental impairment(s)."  SSR 96-7p, 1996 WL 374186, at *2.

breath, weakness, or nervousness," id., are alleged, SSR 96-7p

prescribes a two-step evaluation process:

> * First, the adjudicator must consider whether there
> is an underlying medically determinable physical or
> mental impairment(s) – i.e., an impairment(s) that can
> be shown by medically acceptable clinical and
> laboratory diagnostic techniques – that could
> reasonably be expected to produce the individual's
> pain or other symptoms. . . .  If there is no
> medically determinable physical or mental
> impairment(s), or if there is a medically determinable
> physical or mental impairment(s) but the impairment(s)
> could not reasonably be expected to produce the
> individual's pain or other symptoms, the symptoms
> cannot be found to affect the individual's ability to
> do basic work activities.
>
> * Second, once an underlying physical or mental
> impairment(s) that could reasonably be expected to
> produce the individual's pain or other symptoms has
> been shown, the adjudicator must evaluate the
> intensity, persistence, and limiting effects of the
> individual's symptoms to determine the extent to which
> the symptoms limit the individual's ability to do
> basic work activities.  For this purpose, whenever the
> individual's statements about the intensity,
> persistence, or functionally limiting effects of pain
> or other symptoms are not substantiated by objective
> medical evidence, the adjudicator must make a finding
> on the credibility of the individual's statements
> based on a consideration of the entire case record.

1996 WL 374186, at *2.  In addition:

> When additional information is needed to assess the
> credibility of the individual's statements about
> symptoms and their effects, the adjudicator must make
> every reasonable effort to obtain available
> information that could shed light on the credibility
> of the individual's statements.  In recognition of the
> fact that an individual's symptoms can sometimes
> suggest a greater level of severity of impairment than
> can be shown by the objective medical evidence alone,

20 CFR 404.1529(c) and 416.929(c) describe the kinds
of evidence, including the factors below, that the
adjudicator must consider in addition to the objective
medical evidence when assessing the credibility of an
individual's statements:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and
> intensity of the individual's pain or other
> symptoms;
>
> 3. Factors that precipitate and aggravate the
> symptoms;
>
> 4. The type, dosage, effectiveness, and side
> effects of any medication the individual takes or
> has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the
> individual receives or has received for relief of
> pain or other symptoms;
>
> 6. Any measures other than treatment the
> individual uses or has used to relieve pain or
> other symptoms (e.g., lying flat on his or her
> back, standing for 15 to 20 minutes every hour,
> or sleeping on a board); and
>
> 7. Any other factors concerning the individual's
> functional limitations and restrictions due to
> pain or other symptoms.

1996 WL 374186, at *3.

SSR 96-7p outlines a specific staged inquiry that consists

of the following questions, in the following order: (1) does the

claimant have an underlying impairment that could produce his or

her symptoms?; (2) if so, are the claimant's statements about

his or her symptoms substantiated by objective medical

evidence?; and (3) if not, are the claimant's statements about
those symptoms credible?

Here, the ALJ set out the applicable analytical framework,
Tr. 28-29, and then identified various statements by Goodwin
concerning the allegedly disabling symptom he claimed, i.e.,
pain, Tr. 29.  Then, while he did not specifically answer the
three questions identified above, the ALJ identified substantial
evidence in the record that is more than sufficient to support a
determination that Goodwin's claims of disabling pain are not
credible.  The ALJ referred to: (1) Dr. Axline's opinion that
Goodwin was prone to symptom exaggeration (based on the
observations of two examining medical professionals); (2)
Goodwin's return to carpentry work in 1978, and his long-term
employment at the power plant; (3) his work as a self-employed
auto mechanic in 1987; (4) his statement that he could lift up
to twenty-five pounds during the relevant period; (5) his
description of his daily activities during the relevant period;
(6) his use of only over-the-counter pain medication; and (7)
his treating physician's repeated encouragement of a return to
work during the relevant time period.  Tr. 29.  Even without Dr.
Axline's testimony about symptom magnification, which appears to
be Goodwin's principal concern in his seventh legal argument,
substantial evidence supports the ALJ's determination that

Goodwin's statements about his pain are insufficient to establish a disability.

Goodwin's ninth and tenth legal issues are not well enough developed to merit further consideration.  The ninth issue consists of a single sentence ("The ALJ and the DRB failed to do analysis of the combined effects of the Plaintiff's mental and physical problems."  Pl.'s Mem. of Law, at 24.), and his tenth legal issue consists of a due-process challenge based on the alleged untimeliness of the ALJ's written decision and an equal-protection challenge to a DRB procedure that applies to this region of the country, but not to the rest of the country.

### Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Goodwin's claim, see Manso-Pizarro, 76 F.3d at 16, I recommend that: (1) Goodwin's motion for an order reversing the Commissioner's decision, doc. no. 8, be denied; and (2) the Commissioner's motion for an order affirming his decision, doc. no. 12, be granted.

Any objection to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauth. Pract.

of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992);

United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
Landya McCafferty
United States Magistrate Judge


Dated:  April 11, 2011

cc:  Karen B. Fitzmaurice, Esq.
     T. David Plourde, Esq.
     Remington O. Schmidt, Esq.